26 C.C.P.A.(Patents)
## KING v. YOUNG.
### Patent Appeal No. 4033.

Court of Customs and Patent Appeals.
Dec. 27, 1938.

Joseph M. King, pro se.

Charles F. Murray, of Chicago, Ill. (Joseph H. Milans, of Washington, D. C., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

LENROOT, Associate Judge.

This is an appeal in an interference proceeding wherein a single count forms the issue. The Examiner of Interferences awarded priority of invention to appellant. The Board of Appeals reversed this decision and awarded priority to appellee. From such decision appellant took this appeal.

The interference arises between an application of appellant filed on October 16, 1933, and an application of appellee filed on May 28, 1934. Appellee being the junior party, the burden was upon him

to establish priority of invention by a preponderance of the evidence.

The count in issue reads as follows: "1. In combination, a casing having inlets for hot and cold fluids and an outlet for the mixed fluids, a pressure equalizing piston mounted in said casing and arranged to permit the delivery of a volume of hot and cold fluids in proportion to the relative pressures thereof, a thermostatic member in the outlet passage for the mixed fluids, and a proportioning valve operated by said thermostatic member for delivering a quantity of the respective hot and cold fluids in the proper proportions to maintain a predetermined temperature of the mixed fluids, the position of the equalizing element in the casing being such that the fluids must first pass that element before being intermixed."

As stated by the Examiner of Interferences, "The invention involved relates to a mixing valve for fluids such as may be used in connection with shower baths in which there is combined in a single casing a thermostatic type regulator, which is old and well-known in the art, with a pressure regulator which controls the flow of fluid into the thermostatic regulator in response to the pressure in either the hot or cold line to the end that the mixed fluid at the outlet of the device is maintained at a more uniform temperature than heretofore possible in spite of pressure fluctuations in the supply lines."

The preliminary statement of appellant alleged conception and disclosure to others of the invention on December 31, 1930, and its reduction to practice on March 18, 1931. Appellee in his preliminary statement alleged conception and disclosure to others of the invention on December 15, 1931, and its reduction to practice on January 13, 1933.

Both sides took testimony.

The issue before us involves the construction of a certain element of the count hereinafter discussed, and questions of fact respecting the conception and reduction to practice of the invention by the respective parties.

Before proceeding to a consideration of the questions involved we think it proper to make some observations with respect to appellant. Because of poverty, at no time has he been represented by counsel, and appellant has conducted personally the interference in his behalf. He personally argued the appeal before us. He does not profess to have any familiarity with patent law; in his brief he states that, prior to this proceeding, he had never heard of the term "reduction to practice," and upon oral argument before us stated that he was not aware that his own testimony regarding reduction to practice of the invention required corroboration in order to establish such reduction to practice. Appellant also feels outraged over the decision of the Board of Appeals, due to his ignorance of elementary principles of patent law, which the board of course followed. The foregoing is not intended as any reflection upon appellant, for we are impressed with his honesty, and his conviction that he is the first inventor of the invention here involved. Had his case been conducted by an attorney familiar with patent law, this appeal probably would not have been before us. It was his misfortune that he was unable to employ counsel.

Because of appellant's unfamiliarity with patent law, his brief before us has been of little assistance, but we have carefully examined the record, giving thereto full weight and to all the testimony and proper inferences therefrom favorable to appellant; but of course we can not render, nor does appellant ask that we render, a decision in his favor unless the same is warranted by the evidence in the record before us, and in accordance with established principles of law.

With these observations we proceed to a consideration of the merits of the case. We will first review the testimony and decisions of the Patent Office tribunals with respect to appellee's conception and reduction to practice of the invention.

Appellee testified that he was superintendent of the Powers Regulator Company, to whom his application has been assigned; that said company is engaged in the manufacture of temperature and pressure control apparatus, among which are controllers for mixing hot and cold water; that on or about December 9, 1932, Mr. Powers, president of the Powers Regulator Company, brought him a letter which stated that trouble arose over the operation of certain controllers made by the Powers Company and installed at the Pilgrim Hospital in Long Island, the cause of the trouble being pressure fluctuations; that thereupon appellee conceived the invention in issue and caused a device in accordance therewith to be constructed

which device was completed and successfully tested in December, 1932, and that the same was, on January 13, 1933, sent to said hospital.

Two witnesses, employees of the Powers Regulator Company, corroborated the testimony of appellee with respect to building and testing the controller. The device testified to was offered in evidence as Young Exhibit 6, and was before us for inspection.

This Exhibit 6 differs from the controller shown in the drawings of both appellant and appellee in that the cylinder carrying the equalizing piston in Exhibit 6 is installed transversely of the controller body, while in the applications the piston is shown as installed longitudinally or vertically relative to the controller casing; also, it appears from the testimony that the cylinder and equalizing piston of Exhibit 6 were originally made separately, and thereafter a portion of the controller casing was cut out and the cylinder, carrying the pressure equalizing piston, was set into the controller casing transversely and soldered, connecting parts having been made to the valve chamber of the controller body. The portion so set in projected through said opening so that a part of it was within the controller body. Exhibit 6 also contains a removable metal cover or shield extending over a portion of the controller body, apparently for the purpose of improving its appearance.

The testimony on behalf of appellee further shows that, following the manufacture and shipment of Exhibit 6, another controller of almost the same construction was built and shipped to Harrisburg, Pa., on June 16, 1933; that thereafter, after experimenting, the form of the controller was so changed that the pressure equalizing piston and cylinder were placed in the controller body in a vertical position, as shown in the application drawings, and that in the latter part of 1933 fifteen of the controllers of the vertical piston type were manufactured and shipped to Harrisburg.

In view of our conclusion that the building and testing of Exhibit 6 constituted a reduction to practice of the invention, we find it unnecessary to discuss the subsequent building and testing of other controllers embodying the invention.

With respect to this phase of the case the principal question is whether or not said Exhibit 6 responds to the elements of the count in issue.

The Examiner of Interferences held that it did not, and in his decision stated:

"The device, Exhibit 6, upon which Young relies principally for his reduction to practice, does not respond to the terms of the count in issue. The count calls for a casing having inlets for hot and cold fluids and an outlet for the mixed fluids; certainly the sheet metal shell which covers the central portion of the device of Exhibit 6 can not be considered the casing as the openings therein through which the hot and cold water pipes pass are not inlets therefor in the commonly accepted meaning of this term. The term 'inlet' is deemed to mean a passageway into the enclosure which is to retain or confine the fluid and the term is so used in the Young specification wherein the casting 10 is referred to as the casing. The outer shell of Exhibit 6 is not adapted to confine or retain the fluid. The same considerations are applicable to the term 'outlet' which means a passage to carry away fluids from an enclosure. Thus it is seen that the casing must be the body into which the hot and cold pipes are threaded.

"The next limitation of the count is that the pressure equalizing piston is mounted in said casing. In Exhibit 6 the casing has an opening cut in it and a cylinder carrying the pressure equalizing piston is set in this opening so that it projects partly therein as shown in Exhibit 6a and is soldered in place. The cylinder is not part of the casing but is merely carried by the casing. The piston is in no sense enclosed or encompassed by the casing which carries the water inlets and outlet and hence can not be considered as being in or mounted in said casing. The language obviously was to define the piston as being within the casting as shown in the application drawing on which the count properly reads. It also properly reads on the structure shown in King's application drawings in which the piston is mounted within the casting."

The Examiner of Interferences further held that appellee was not entitled to a date for conception of the invention prior to July 7, 1933, and that appellee had not established actual reduction to practice of the invention prior to appellant's filing date, October 16, 1933. The examiner further found that appellant was entitled to

the date of July 5, 1933, for conception of the invention, and to his filing date, October 16, 1933, for its constructive reduction to practice. Finding therefore that appellant was the first to conceive and the first to reduce the invention to practice, the examiner awarded priority of invention to appellant.

The Board of Appeals reversed the decision of the Examiner of Interferences and awarded priority of invention to appellee, holding that Exhibit 6 does respond to the terms of the count and that it was manufactured and successfully tested in December, 1932. In its decision the board stated:

"The examiner has held that the device constituting Exhibit 6, upon which Young relies for his reduction to practice, does not respond to the terms of the count in issue. It is his position that the count calls for a casing having inlets for hot and cold fluids and an outlet for the mixed fluids and that the sheet metal shield which covers the central portion of the device of Exhibit 6 cannot be considered the casing as the openings therein through which the hot and cold water pipes pass are not inlets therefor in the commonly accepted meaning of this term.

"The examiner further points out that the count is limited to say that the pressure equalizing piston is mounted in said casing. The Examiner of Interferences points out that in Exhibit 6 the casing has an opening cut in it and a cylinder carrying the pressure equalizing piston is set in this opening so that it projects partly therein, as shown in Exhibit 6a, and is soldered in place. It is considered by the Examiner of Interferences that the cylinder is not part of the casing but is merely carried by the casing, that the piston is in no sense enclosed or encompassed by the casing which carries the water inlets and outlet and hence can not be considered as being in or mounted in said casing.

"We do not agree with the conclusions of the Examiner of Interferences as to the reading of the count on the structure of Exhibit 6. It is believed that, in substance, a cylinder set into the cut-out portion in the casing proper and soldered into position becomes a part of the casing and that the piston is mounted in the casing, according to the requirements of the count. It is not apparent that the sheet metal shield which covers the central portion of the device of Exhibit 6 is depend-

ed on by appellant or any one to constitute the casing of the count nor is it believed necessary that it should be relied on for that purpose."

We are in agreement with the above quoted views of the board and can add little thereto. It is elementary that the counts of an interference must be given the broadest construction that their language will reasonably permit, but that express limitations can not be ignored. The count does not require a vertical piston. Whether or not the term "mounted in" should be construed as meaning that the equalizing piston must be wholly within the casing of the controller body, we agree with the board that when a part of the casing of the controller body was cut out and the cylinder carrying the equalizing piston was projected into said opening, said cylinder became in fact a part of the casing.

The board, however, accorded appellee a date of reduction to practice as of December, 1932, while the earliest date of reduction to practice alleged in appellee's preliminary statement is January 13, 1933. While we agree with the board that reduction to practice is established by appellee as of December, 1932, he may not be awarded a date earlier than the date alleged in his preliminary statement. Mitchell v. Morrison et al., 38 F.2d 356, 17 C.C.P.A., Patents, 886. We therefore hold that appellee is entitled to a date of conception as of December, 1932, and to January 13, 1933, for reduction to practice.

We next come to a consideration of the testimony on behalf of appellant with respect to his conception and reduction to practice of the invention as set forth in the count. It appears that appellant was employed as an engineer in charge of the experimental department of the Henry Ford Trade School at Detroit, Michigan, and that while so employed there was assigned to him in 1928 the task of designing a temperature regulating device for rubber mills; that after some progress had been made in that work it was suggested that the principle upon which he was working might be adapted to a shower bath valve. Appellant testified, upon interrogatories propounded by himself, that by December 31, 1930, he had conceived the invention in issue. Appellant described the claimed invention of December 31, 1930, as follows:

"Q. 10. Describe the said original invention. A. The said invention is described correctly and explicitly by the said interference claim, devised and prescribed by the Examiner in an official action dated July 10, 1935, Case 71,126.

"The said invention, as disclosed in my application, filed October 16, 1933, Serial No. 693,845, is provided with means to cause the hot water to flow solely in response to the pressure of the cold water. The said original invention was not provided with such means."

Appellant testified that the invention was reduced to practice on March 18, 1931, but he did not testify as to how the device was constructed, other than to state that it conformed to the interference count. He did testify, however, that it was installed "on the student's lavatory" in the Henry Ford Trade School for general use. He did not testify with respect to the result of the test of the device. Appellant, being ignorant of the rules of evidence, may have thought that his preliminary statement was a part of the evidence in the case, and that it was not necessary for him to repeat in his deposition matters contained in his preliminary statement. In his preliminary statement he alleged that the device was built and was, on March 18, 1931, installed in said lavatory and successfully tested. Of course we may not consider as evidence in the case any portion of said preliminary statement. However, we think the testimony of his corroborating witnesses establishes that the device so installed in said lavatory was successfully operated, and if the device corresponded to the count before us, such test constituted a reduction to practice of the invention.

One of the exhibits in the record is No. 27, which appears to be a photostatic copy of Figures 1, 2, and 3 of the drawings of appellant's application.

A witness in behalf of appellant, one Bruno J. Chudy, testified that in 1930 and 1931 he was attending the Henry Ford Trade School and that, until about the middle of March, 1931, he was in appellant's department. He further testified as follows:

"Q. 6. Mr. Chudy, I have a print here (showing Exhibit 27). Did you work at that? Was it anything like that? A. Yes, this is it here (pointing to Exhibit 27).

"Q. 7. You say it was like that? What did it consist of? A. As far as I can remember, I know that we did have the coils comprised of two metals that I helped wind for this particular valve and we also had a cylinder that we had difficulty making. We made it out of two pieces, but later on, four or five months after I left the department, Mr. Remington made one out of a one-piece casting, which was quite an achievement and very valuable.

"Q. 8. Did this one you worked on have a piston valve like that one (indicating Exhibit 27)? A. Yes.

"Q. 9. Was the piston valve exactly like that or can't you remember? A. I can't remember—according to the print, no, although it does resemble this.

"Q. 10. What else did the valve have besides that piston and the thermostatic element you spoke of? A. I can't quite remember, but I do recall it had a sort of equalizing valve. As I remember your reading in your statement, at one time it wasn't bored at all."

He further testified that the device was installed in the student's lavatory sink and tested.

Another witness, one Remington, testified that he worked upon the device that was installed on the students' lavatory sink, about March, 1931. He further testified in part as follows:

"Q. 9. This drawing (showing Exhibit 27), was it like that? A. Yes, something like that.

"Q. 10. What was different? A. Well, our thermo control was down here at the bottom, underneath instead of at the side, and I believe we had one coil instead of three. I'm not sure, but I believe we did, and it was made out of a solid piece of stock—two separate pieces.

"Q. 11. Were they joined together? A. Yes, sir, we joined them together."

Robert Teeple testified that in 1930, 1931, and 1932 he had charge of the drafting room of the Ford Trade School, and that between July 4 and Labor Day in 1931 he made certain drawings for appellant from a blue print which was marked Exhibit 2. He further testified in part as follows:

"Q. 11. Did you ever go down into the experimental department before you did that drawing and see the one we had

on the rack there? A. Several times, probably about once a week.

"Q. 12. What, if anything, did you see down there? A. I saw a sort of rough-looking valve, made in two pieces, and a couple of pipes sticking out from it.

"Q. 13. About what month was that? A. That was about April but you had it on there later; you kept it on there."

One Carl Boehnke testified that during the years 1930, 1931, and 1932 he was an instructor in the Henry Ford Trade School. He further testified in part as follows:

"Q. 4. Did you ever make a drawing of this valve or one something like it (showing Exhibit 27)? A. Similar to it.

"Q. 5. When did you make those drawings? A. After we moved from Highland Park.

"Q. 6. About how long after you moved? A. Well, as I remember, we were working on those in Highland Park. I remember you were getting ready to move and it was between then—

"Q. 7. Was it in 1930? A. We moved in 1930.

"Q. 8. Was it in 1930 you made drawings of the valve? A. Yes sir.

"Q. 9. Did you ever see this on the rack? A. Yes, I did.

"Q. 10. What did it look like? A. Well, it looked very crude—hand-made affair. Well, it was like two cylinders stuck together with a couple of pipes.

"Q. 11. About when was that? A. That was between, as I remember, between Mr. Ebling's death and July.

"Q. 12. You say you remember making these drawings from sketches in 1930 (showing Exhibit 27)?

"Mr. Murray: I shall object to attempting to prove any date previous to December, 1930.

"Q. 13. Did you make any drawings of this valve according to the interference claim, such as you see here? Did you do that or had completed it by December 31, 1930? A. Yes sir.

"Q. 14. Then you have seen that working on the rack? A. Yes.

"Q. 15. Same invention you drew up, and you know what it was? A. Yes, I am familiar with it."

The witness Geisler testified to the successful operation of the device first built.

Upon cross-examination he testified as follows:

"Q. 1. Please describe the apparatus about which you have been testifying. Was it two separate units joined by pipes— one housing containing the pressure equalizing valve and the other unit containing the thermostatic and proportioning valve? A. When I first saw the device it was in two parts, but I would like to add that when I last saw it it was welded together. But of course I was criticizing the first because it was too bulky."

The witness Hollis testified that in 1930, 1931, and 1932 he was an instructor in the Henry Ford Trade School in the experimental department. He further testified as follows:

"Q. 9. I revealed to you the invention, such as the pressure equalizing valve, the emitting or proportioning outlet valve, and thermostatic element—did I reveal that to you? A. Yes sir.

"Q. 10. About when? A. I would say before December 31, 1930.

"Q. 11. Some of the work on the valve was done in your department? A. Yes sir.

"Q. 12. Did you see the valve at work? A. Yes sir.

"Q. 13. Do you remember the first valve, what it looked like? A. Yes sir.

"Q. 14. Describe that. A. It was composed of two pieces, machined, one holding the equalizer which was joined with two pieces of pipe to a larger piece holding the thermocoil, which governed the proportioning valve.

"Q. 15. To which does the water come first? A. To the equalizer.

"Q. 16. About when was that that you saw it? A. I saw it before it was completed, before the death of Mr. Ebling, and I saw it after it was completed, soon after his death.

"Q. 17. Do I understand you to say that those two pieces were joined together so as to form a casing? A. I always considered it a unit, but this first one was not a casting, it was made of two pieces machined and joined together.

"Q. 18. Did you see the second one that we made? A. Yes sir.

"Q. 19. Was that a casting? A. Yes, all in one piece.

"Q. 20. You considered the first one a unit? A. Yes, I considered it all one unit.

"Q. 21. Are you interested in this concern? A. Yes sir.

"Q. 22. How much interest? A. One per cent interest."

Harry A. Smith testified that in 1930, 1931, and 1932 he was working in the Henry Ford Trade School, and further testified as follows:

"Q. 3. Did you do any work on a shower-bath valve while you were there? A. Yes, I had charge of the lathe work. I did about all your lathe work from about May, 1929.

"Q. 4. This valve that we were making—what did it consist of? A. The valve itself—I never had much to do with the contruction—except to make the parts, all your pistons and small screws and small parts.

"Q. 5. You have seen the valve? A. I have seen it on a test on the rack several times. I tried the valve on the rack, watching the pressure gauges, and washed my hands at the rack.

"Q. 6. What did this valve consist of? A. It consisted of an equalizing pressure valve, proportioning valve, and thermostatic member in the mixing chamber.

"Q. 7. How did the water enter? A. It first entered in the equalizing valve.

"Q. 8. Did I reveal this to you and if so, when did I reveal it to you? A. The first time it was revealed to me was along about January, 1931. I had some pistons or parts which I delivered to you. Just after getting them there, you or Mr. Remington asked if I knew what they were, and I said no, and they said it was for a shower-bath and explained it. And I said it would be a good thing for a barber or beauty shop. I had heard different barbers complaining of people being burned by water.

"Q. 9. That was January, 1931? A. Yes.

"Q. 10. Did you see it at work on the sink? A. I saw it on the sink and also on the testing rack.

"Q. 11. It was the same one you have described here? A. Yes.

"Q. 12. This same one you saw was not a casting, not the first one? A. No.

"Q. 13. How was it made? A. I just said it was pieces welded together.

"Q. 14. So that it formed one unit? A. Yes."

Upon cross-examination the witness testified as follows:

"Q. 2. Do I understand you made two separate castings? That is, you took a body of metal and bored it out for a cylinder and then you turned a piston to work in that cylinder? A. We made a piston for the job, turned up a piston from a sketch.

"Q. 3. Did you join these two cylinders by pipe? A. That was done by Mr. Remington or the man on the bench."

It is apparent from the foregoing that the device successfully operated in March, 1931, consisted originally of two parts joined together by pipes, and we infer that, as installed upon the lavatory sink, the two parts were welded together, the pipes being dispensed with.

It is also clearly apparent that this device did not conform to the count before us. The pressure equalizing valve clearly was not "mounted in" the casing, nor did it form a part of the casing of the device. The valve was attached thereto first by pipes, and later by welding; but, unlike appellee's Exhibit 6, no part of the casing to which the cylinder containing the pressure equalizing valve was attached was cut out, and therefore the original casing was intact, while in Exhibit 6 a portion of the casing was cut away and the portion containing the pressure equalizing valve became a part of the casing, conformably to the count.

It may be that appellant's said device accomplished the same purpose as appellee's Exhibit 6. This we are not called upon to determine, for it is well established that in interference counts express limitations may not be ignored. Sweetland v. Cole, 53 F.2d 709, 19 C.C.P.A., Patents, 751.

Of course, the specific description of the construction of the device by appellant's witnesses overcomes the general statement of appellant that the device conformed to the count before us, for such statement was merely a conclusion upon his part.

We are therefore constrained to agree with the Patent Office tribunals that appellant has not established either conception or reduction to practice of the invention embraced in the count in or prior to March, 1931.

We next come to consider the evidence as to the date to which appellant is entitled for conception and reduction to practice of the invention. Upon this point we have concurring decisions of the Patent Office tribunals that appellant is not entitled to dates for conception or reduction to practice of the invention prior to January 19, 1933, the examiner holding that appellant was entitled to a date as of July 5, 1933, for conception of the invention, and to his filing date, October 16, 1933, for a constructive reduction to practice, while the Board of Appeals held that in no event could appellant be given a date for conception earlier than January 19, 1933, and reduction to practice as of August 14, 1933, both of which dates are subsequent to the dates awarded by the board to appellee for conception and reduction to practice of the invention, and subsequent to the date to which, we hold, appellee is entitled for reduction to practice under his preliminary statement.

It is well established that in interference cases concurring decisions of the Patent Office tribunals upon questions of fact will not be disturbed unless they are manifestly wrong. Beidler v. Caps et al., 36 F.2d 122, 17 C.C.P.A., Patents, 703.

The first possible date that could be granted to appellant for conception of the invention conformable to the count is August 28, 1931, when application for patent, Exhibit 3a, was signed by appellant and notarized before a notary public. This application describes a device which seems to conform to the count in issue. The application, however, was never filed in the Patent Office. Appellant testified that a model was made which conformed to said application, and that it was tested on August 28, 1931. Two witnesses for appellant testified that a second model was made out of a one-piece casting, but there is no evidence in the record corroborating appellant's testimony that said second model was tested.

Upon the oral argument before us appellant stated that he did not know that the law required corroboration of his testimony with respect to actual reduction to practice to enable him to succeed. That such is the law is well established. Janette v. Folds et al., 38 F.2d 361, 17 C.C.P.A., Patents, 879.

It is therefore plain that appellant has not established reduction to practice through the second model made by him.

Appellant further testified that a third model was made by him which conformed to the count, and that it was completed and installed by May, 1933; that the device was made from drawings dated January, 1933, and that it was successfully tested in Detroit in June, 1933, and again in August, 1933. This testimony is corroborated by one of appellant's witnesses. However, this reduction to practice occurred long after appellee had reduced the invention to practice, and as stated, if appellant be given the date of the drawings from which the third model was made, January 19, 1933, this was subsequent to the date of conception and reduction to practice of the invention by appellee.

Furthermore, if appellant be given the date of August 28, 1931, for conception of the invention, a reduction to practice by him in June, 1933, would avail him nothing, for the law required that, if he was the first to conceive the invention, he must have been diligent in reducing it to practice at and immediately before appellee entered the field in December, 1932.

There is no evidence whatever in the record, oral or documentary, of any activity upon the part of appellant in reducing the invention to practice during the year 1932.

It thus appears that appellant can not rely upon either of models two or three for reduction to practice of the invention, and the Board of Appeals was clearly right in awarding priority of invention to appellee upon the record made.

This opinion is much more extended than would have been necessary had appellant been represented by counsel, for in that event his counsel would not have made many of the contentions urged by appellant, to which we have given careful attention.

Appellant should understand that rules of law are necessary in the conduct of interference proceedings, and in the determination of the issues therein. Our jurisdiction in these proceedings is purely statutory, and we must decide the case upon the record made and certified to this court. This we have done.

For the reasons herein stated, the decision of the Board of Appeals is affirmed.

Affirmed.