34 C.C.P.A. (Patents)

## LAND v. KASEMANN.

### Patent Appeal No. 5321.

Court of Customs and Patent Appeals.

June 17, 1947.

Donald L. Brown, of New York City (Charles Mikulka, of New York City, of counsel), for appellant.

Samuel Z. Gordon, of Washington, D. C., for appellee.

Before BLAND, Acting Presiding Judge, and HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

O'CONNELL, Associate Judge.

This is an appeal from the decision of the Board of Interference Examiners of the United States Patent Office awarding priority of invention to appellee, Kasemann, of the subject matter defined by the one count in issue.

The interference is between appellant's application, Serial No. 237,783, filed October 29, 1938; and the patent to Kasemann, No. 2,236,972, issued April 1, 1941, on an application, Serial No. 154,204, filed July 17, 1937. Kasemann is therefore the senior party, having filed his application approximately a year and three months before the filing date of appellant's application.

Appellee offered no testimony and is therefore restricted to the filing date of his application for conception and constructive reduction to practice.

Appellant, the junior party, introduced evidence including certain exhibits for the purpose of proving conception and reduction to practice prior to appellee's filing date, and it is not disputed that appellant had the burden of establishing his position by a preponderance of the evidence.

The count is claim 1 of Kasemann's patent and was copied by appellant for the purpose of interference. The count sufficiently describes the involved invention and reads as follows:

"1. A transparent polarizing sheet, the micelles of which are oriented substantially in one direction, said sheet consisting of colloidal cellulose hydrate, and containing complementary dyes, the molecules of which are attached to said micelles, and give a neutral gray color."

The elements of the invention defined by the count and disclosed by the record are (1) a polarizer which must be a transparent sheet consisting of cellophane or colloidal cellulose hydrate, (2) the micelles or long-chain molecules of which must be oriented substantially in one direction as by stretching; (3) the cellophane must contain complementary dyes the molecules of which are attached to the micelles of the cellophane and (4) give a neutral gray color.

Depositions of witnesses examined in behalf of appellant were taken at the office of the Polaroid Corporation, Cambridge, Massachusetts, commencing Thursday, May 16, 1944. All such testimony was offered as relevant in Interference No. 80,-659, which is not now before us for consideration, and only so much of such testimony as may relate to the dyeing or staining of regenerated cellulose nitrate, or cellophane sheeting, and to the stretching or extension of the cellulose sheets, was offered as relevant to the issue here involved.

The board in reaching its conclusion held that appellant not only failed to establish conception prior to appellee's filing date but also failed to establish either prior reduction to practice or diligence in reducing to practice during the critical period.

Appellant alleged in his preliminary statement that he made the first written description of the invention set forth in the declaration of interference herein on or about September 30, 1932; that in the late summer or early fall of that year he disclosed the invention to others; and that he relied upon the aforesaid written description and disclosure to others as establishing conception of the invention, inasmuch as he had made no sketch thereof prior to filing his application for a patent.

The record discloses that for many years prior to 1936 appellant maintained a laboratory at 168 Dartmouth Street, Boston, Massachusetts, and that in the spring or summer of 1936 he moved the laboratory from the address on Dartmouth Street to an address on Columbus Avenue in the same city.

Appellant's testimony upon which he relies to establish conception has to do solely with disclosures made by him and with experiments made by him and others prior to the date the laboratory was moved from the Dartmouth Street address. Appellant kept no complete records and it was therefore impossible for him and his witnesses to fix the dates of many events other than that they occurred prior to the transfer of the laboratory from Dartmouth Street.

The first person examined in behalf of appellant was the witness Amon who testified that he had been employed by the Polaroid Corporation since June, 1939, and that during the week previous to May 16, 1944, he had been given the job by appellant "of forming a neutral polarizer in cellophane which I first was to orient, using a zinc chloride method, and the neutral color of which was to be formed by the use of complementary dyes"; that he was told by appellant to use several dyes, "some of which were Pontamine Yellow SX, Pontamine Black EBN; bensopurpurin, Pontamine Blue RX. I guess there were Victoria Blues in there. I think the name should be Pontamine Blue RW. I don't recall whether it is RX or RW."

The witness testified that he was also told by appellant how to prepare the "neutrals"; and that he prepared several samples thereof under appellant's direction—the first of which was submitted in evidence as Land's Exhibit 1. The method of preparing Land's Exhibit 1, was the same procedure followed by the witnesses in preparing Land's Exhibits 2, 3, 4, and 5 herein.

Appellant testified that he was president and director of research of the Polaroid Corporation and had been with that organization or its predecessors since 1932; that he and his associates were doing a variety of general research in their Dartmouth Street laboratory, and in particular were working on the development of polarizing sheet material; that his main activity with cellophane was to try a variety of dyes from time to time in the hope not only of finding more efficient ones but also to study the techniques of imbibing the dyes in the cellophane for a maximum efficiency of deposition of the dye.

Appellant stated that he had a collection of dyes, the names of which he could not remember, and tried a number of processes for staining cellophane; that he had been interested mainly in making a polarizer efficient enough for use on automobile headlights, which required an extremely efficient polarizer as well as a neutral one; and that "It was relatively easy to get neutral polarizers in cellophane by mixing dyes."

In the first work of dyeing and staining of cellophane, appellant stated he used water, sometimes with methanol in it, with the dye dissolved in the water, and sometimes with other salts added to the dye solution. The cellophane, he explained, was dipped in the dye solution which swelled it slightly, the dye would be imbibed and the cellophane was then held tight across a hot plate to dry it off.

Shortly thereafter, appellant started using zinc chloride in the solution because, he stated, zinc chloride, preferably before dyeing, would enable him to stretch the cellophane sheet farther than it could be stretched in water. The zinc chloride, he explained, was distinctly efficacious in making iodine deposits in cellulose and helped a great deal in getting the cellulose well oriented for the dyes.

Appellant testified that another technique was also tried but it did not give a polarizer efficient enough to compete with the corporation's other polarizers; but did give a polarizer that would have been usable for sun glasses if the corporation's other polarizers had not existed.

Appellant further testified that the collection of dyes he had available in making the experiments at the Dartmouth Street laboratory in 1936 were turned over by him to the witness Amon in 1944 with instructions as to the preparation and production

of the neutral polarizers referred to herein as Land's Exhibits 1 to 5, inclusive. In this connection, the record discloses the following testimony given by appellant:

"Q. 38. Have you seen the polarizers produced by Mr. Amon recently? A. Yes.

"Q. 39. Some of them are in evidence as Land's Exhibits 1–5. Will you look at them and tell us if you can make any comparison as to the color and/or polarizing properties of these filters and those you made in the Dartmouth Street laboratory? A. [Witness examines exhibits.] I'd say they were comparable, about the same in dichroic ratio as many I have made, and about the same in color.

"Q. 40. Do you know of any commercial use for cellophane polarizers made in this way and possessing the properties of the cellophane strips shown in Exhibits 1–5? A. Well, I suppose they might be used for schoolroom demonstration, if nothing better were available, showing dichroism, and whether they might get by as useful in a sunglass, if nothing better were available, I don't know. I suppose if there were no better polarizer we could use them in sunglasses."

Appellant testified further that personally he usually kept no notes, that he had none in connection with the invention of the count, and that he either told his attorney Brown about it or else the work was recorded in the workbooks of the men working for him. Appellant also testified that he did not keep any of the dyed cellophanes that he made in the Dartmouth Street laboratory, nor was he able to produce any dyed sheet which embodied the elements of the polarizer defined by the count.

The witness Brown testified that he had been associated with appellant in a social and business way since 1928; that he had been patent counsel for appellant, the Polaroid Corporation, and its predecessor over a period of years, and that he prepared the application here in interference as a result of disclosures made to him in Boston on August 25 and 26, 1938 by appellant and his associates.

The witness stated that on September 30, 1932, appellant visited Brown's office in New York and disclosed to him a "new invention" relating to a so-called "multiple-dye polarizer," and that he dictated a memorandum thereon in appellant's presence, a photostatic copy of which, Exhibit 22, is now before the court. The witness explained that appellant stated at the time that he had been working on the idea as a substitute polarizer for the suspension of herapathite crystals. No structure was shown to the witness in connection with that disclosure.

The witness further testified that in 1933 he began to make regular visits to appellant's laboratory on Dartmouth Street in Boston, and sometime prior to the summer of 1934 saw appellant make the tests described by appellant; that appellant made solutions of the dyes, which the witness could not name, "with the exception of three dyes—benzopurpurine, congo red and methylene blue;" that appellant showed the films he made in the tests, which films the witness examined through the polariscope. Those films, the witness stated, "showed appreciable dichroism, although the dichroism was not such as would compare with that of the suspended crystalline polarizers being made at that time."

On March 12, 1934, appellant visited Brown in New York and showed him a strip of cellophane which appellant stated he had produced "by preparing a solution of zinc chloride in water, adding iodine to the solution, imbibing the cellophane strip in the solution and then holding it manually under tension until it was dry." On that same day Brown made a memorandum of the above disclosure, a photostatic copy of which was offered in evidence and which is Land's Exhibit 23 herein.

The witness testified that he recalled "this disclosure because the dichroism of the iodine stain in cellophane was of an order substantially better than any that I had seen previously in the cellophane dyed with the colored dyes and it was of an order which showed excellent prospects commercially."

Brown further testified that on May 18, 1934, he dictated another memorandum, Exhibit 24, reporting a disclosure made to him by appellant the preceding day with respect to staining fibers of ramie with the dichroic dye; that in the fall of 1932 he prepared three affidavits, one each for the signature of appellant and his witnesses Wheelwright and Matz, for use in the prosecution of another application which appellant had previously filed.

The three affidavits refer to tests made by the three named witnesses and copies of the affidavits were embodied in one document and submitted herein as Land's Exhibit 25.

The witness Wheelwright testified that he was associated with appellant and the Polaroid Corporation and while working in the Dartmouth Street laboratory saw appellant make tests such as were described in the testimony of the witness Land.

Wheelwright stated that his work was concerned not so much with how the cellophane was stretched and dyed as it was with the results of the process; that while working in the Dartmouth Street laboratory he recalled seeing certain dyed cellophane sheets, but never saw any "which possessed the desired high polarizing properties" required for the three dimensional photographic products in which he was particularly interested; that "We more nearly achieved the neutral color than the high degree of polarization," and that they "had achieved a gray of sorts."

Wheelwright was requested by counsel to examine Land's Exhibits 1 to 5 and compare the gray filters of the dyed cellophane strips of those exhibits with the gray filters which were produced in the Dartmouth Street laboratory.

Based wholly upon his recollection, Wheelwright testified that the gray filters in Land's Exhibits 1, 2, and 5 produced in 1944 were comparable in neutrality to those produced in the Dartmouth Street laboratory but that the degree of neutrality in some of those exhibits was greater than in others.

Wheelwright also testified, in answer to a leading question by appellant's counsel, that he saw appellant combine dyes, and dye a single sheet with them, and that he also saw appellant dye sheets with individual dyes. The witness also stated that the work that was done by appellant and his associates in the Dartmouth Street laboratory in the summer of 1932 and the summer of 1936 was done as a matter of "continuing activity."

The witness Blake was employed by the Polaroid Corporation and worked with appellant in the Dartmouth Street laboratory. The witness stated, among other things, that he talked and worked with appellant who in his experiments at the Dartmouth Street laboratory was interested in arriving "at an exact neutral color."

The witness did not recall the specific dyes that were used by appellant to produce a neutral polarizer by "using a properly balanced mixture of dyes," but stated that the polarizers which were produced at the time were usually "close to neutral" and were about the same as the exhibits produced by the witness Amon in 1944; that he saw appellant perform such tests as described hereinbefore by appellant but was not certain of the exact dates thereof other than that the time was prior to 1936.

The witness Calabro testified that while employed by the Polaroid Corporation at the Dartmouth Street laboratory he worked with appellant whose principal test during the year 1932 was trying to make a neutral polarizer of the crystal suspension type but that appellant was also then working on several other things including dyeing cellophane sheets to make a neutral polarizer.

The witness stated that he recalled seeing appellant make the tests to which appellant referred in his testimony; that appellant showed the dyed cellophane strips to the witness who examined them by the use of polariscope and found that each examined strip had its original color when dipped, that is "If red, when crossed on the polarization axis of the polariscope it would be darker red."

Calabro also testified that appellant had used red, blue, green, black, yellow, and purple dyes; that all of the cellophane strips that appellant treated by his technique were all colored strips; and that

during the period before the laboratory was moved from Dartmouth Street, the work that was done there was not limited to a specific time as "Land was in the habit of continually doing experiments from time to time."

Appellant argues that the fact that much of his testimony is oral and based upon the memories of the witnesses does not render it any the less acceptable. The testimony given by appellant and his witnesses, all of whom were employed by him, was testimony given from recollection a number of years after the time when appellant asserts he conceived the invention of the count, and after the witnesses had the opportunity of acquiring subsequent knowledge of the subject matter involved in the interference.

Such a situation requires a most careful scrutiny of the evidence submitted in behalf of appellant because of "the tendency of even the best minds to forgetfulness, and particularly the tendency to confuse knowledge acquired subsequent to an event with that acquired at the time such event occurred." Langevin v. Nicolson, 110 F.2d 687, 693. 27 C.C.P.A.(Patents) 1022.

The Board of Interference Examiners held that the testimony submitted in behalf of appellant, taken as a whole, failed to establish that he clearly conceived the invention of the count at any time prior to appellee's filing date of July 17, 1937; that the isolated and distinct disclosures made by appellant over a period of years would not amount to a showing that he actually conceived the invention as a whole; and that there was no showing in the record that he had any definite idea of the complete and operative invention as it was thereafter to be applied in practice, citing Harry P. Townsend v. Henry L. Smith, 36 F.2d 292, 17 C.C.P.A.(Patents) 647.

Appellant contends that the board erred not only in making the holdings hereinbefore described but also in failing to hold that he conceived the invention in issue prior to appellee's filing date and on or before September 30, 1932 and at least as early as March 12, 1934.

Appellant further contends that the board erred in failing to hold that the testimony of Land, Blake, Wheelwright, and Brown establishes conception by appellant of the invention of the count at least prior to 1936; and in failing to hold that Land's Exhibits 22 and 23 when considered in connection with the prior art disclosures, the oral testimony, and earlier physical exhibits offered in behalf of appellant, establish conception of the subject matter of the count by appellant. Appellant also urges that the testimony of the witness Calabro and Land's Exhibits 24 and 25 support his position on the question of conception.

Counsel for appellant concedes in his brief "We do not have any single writing prior in date to Kasemann's filing date, nor do we have any physical embodiment of the invention which establishes, standing alone, conception by Land." Counsel for appellant further concedes that no one of Land's Exhibits 22, 23, 24, or 25 embodies a complete disclosure of the invention of the count.

Appellant testified, as hereinbefore described, that in dyeing certain strips of the involved cellophane he had a collection of dyes. He could not, however, identify by name any individual dye or combination of dyes which he then had and purportedly used. For example, the dyes specifically identified by Amon in the production of the exhibits under Land's direction in 1944 were not identified in a similar manner in the testimony given by appellant as to the dyes he purportedly used in staining the cellophane strips prior to 1937.

Nowhere in his testimony did appellant describe a specific neutral gray color nor that he obtained that color in the dyed cellophane by mixing the dyes. Likewise, he failed to mention any degree of temperature, tension, or orientation that was applied by him in the treatment of the cellophane. Neither did he specify how the dyes were to be mixed nor describe any specific experiment which clearly demonstrated not only that he had the idea of a neutral gray polarizer but also that such a polarizer was to be obtained by a mixture of complementary dyes contained in the oriented cellophane sheet.

Appellant urges that Exhibits 22, 23, 24, and 25 when taken together establish that he was possessed of every concept called for by the count and disclosed every such concept at least to the witness Brown, that those exhibits considered in the aggregate amply corroborate the testimony of appellant's witnesses on the question of conception, and establish when read in connection with that testimony that appellant had conceived and disclosed to others the subject matter of the count in issue at least as early as the summer of 1936.

In Exhibit 22 appellant suggested a polarizer comprising a substance using two or more dyes, each of which transmits white light as one component of the issuing beam and each of which absorbs substantially all of the other components save light in one portion of the spectrum. The example cited in the memorandum suggests the use of a red dye and a blue dye. The exhibit, however, makes no reference to the supporting base and is not limited to a cellophane or a molecularly oriented carrier as defined by the count.

Exhibit 23 reads as follows: "Mr. Land has discovered that a solution of iodine and zinc chloride in water, when applied to cellophane, yields a polarizing body which, when dry, appears to have fairly stable properties although it shows considerable color. The proportions used are roughly 9 parts of zinc chloride, 8 parts of water, and a little iodine in saturated solution, and a little potassium iodine."

Obviously Exhibit 23 does not meet the requirements of the count. It is noted that the solution described in the exhibit when applied to cellophane yields a polarizing body which shows considerable color. Moreover, there is no reference in the exhibit to a mixture of dyes nor to the orientation of cellophane by stretching it.

Exhibit 24, the importance of which appellant contends was completely overlooked by the board, refers to the dyeing of ramie by a positive dye with no suggestion of the use of complementary dyes or the achievement of a neutral gray color as called for by the limitations of the count.

Exhibit 25 shows that as early as November, 1932, appellant and his associates were experimenting with glass, mica, and cellophane to produce dye polarizers. Appellant's affidavit, which is part of the exhibit, discloses that he made a number of experiments and found that "only a slight, polarizing effect could be secured where the dyestuffs were used."

The experiments described in Exhibit 25 were not made in connection with appellant's application herein but were made prior to 1932 to show that a patent subsequently cited against another one of appellant's applications was inoperative. The import of Exhibit 25 negatives, rather than supports, the contention that in 1932 appellant conceived the involved invention.

The testimony of the witnesses Brown, Wheelwright, Blake, and Calabro hereinbefore referred to was selected from the record as relevant to the question here in issue and speaks for itself. The court therefore does not deem it necessary to point out the shortcomings of such testimony and thereby unduly extend the length of this opinion, particularly in view of the detailed analysis of the evidence by the Board of Interference Examiners.

Like appellant's own testimony, the testimony of his witnesses is not definite or exact but vague and general. When considered separately and in the aggregate, and in the light of Land's Exhibits 22, 23, 24, and 25, such testimony does not adequately corroborate appellant's own testimony on the issue of prior conception. For example, appellant admits that the testimony of the witness Calabro included everything defined by the limitations of the count "except the use of mixed dyes to produce a neutral color." Furthermore, the testimony of the witness Amon does not establish that the exhibits he produced under appellant's direction in 1944 were the same in character as those conceived and produced by him prior to 1937.

Appellant argues that the prior art embodies a complete disclosure of all the subject matter defined by the limitations of the count with the exception of those limitations which call for the use of complementary dyes to give a neutral gray color. Appellant takes the position that those limitations alone render the subject matter of

the invention patentable over the prior art and that the failure of the board to consider the disclosure of the prior art constituted reversible error.

Appellant also argues that while "It is quite true, as the Board held, that Land has offered no testimony which identifies specifically the combination of dyes employed by him in the production of any specific neutral gray polarizing stain on stretched cellophane," such testimony is unnecessary in view of the knowledge of the art regarding the staining and dyeing of stretched cellophane.

 The authorities cited by appellant in support of the two points just stated do not lay down any principle of law which relieved him of the necessity of establishing by a preponderance of the evidence that he had a complete conception of the invention as defined by the respective and collective elements of the count. On the contrary, the rule is well established that in an interference, expressly defined limitations of a count cannot be ignored. See Ernest J. Sweetland v. Don Cole, 53 F.2d 709, 19 C.C.P.A.(Patents) 751, 754, and authorities therein cited; King v. Young, 100 F.2d 663, 26 C.C.P.A.(Patents) 762, 771.

Counsel for appellee takes the position here that the only reasonable inference to be drawn from appellant's evidence is that the work which was done by him at the Dartmouth Street laboratory prior to appellee's filing date was part of a general and continuing program of research conducted by appellant and his associates in which the specific invention here involved was not clearly shown to have been definitely conceived by appellant.

The record discloses that the Board of Interference Examiners considered the combined disclosures of the exhibits in question together with the prior art and the oral testimony given by each and every witness in behalf of appellant on the question of conception. The board held that by reason of the nature of the evidence submitted, appellant had failed to show clearly and convincingly that he had actually and subjectively conceived the invention in issue as a whole at any time prior to the filing date of appellee's application.

The subject matter of the appeal herein involves a complex question relating to dyes and their reactions under the conditions described in the record. Under such circumstances, this court will not overrule the decision of the board unless the appellant establishes that the decision in question is manifestly wrong.

An examination of the points and authorities cited by appellant, together with a careful review of the testimony and exhibits submitted in his behalf, fails to convince the court that there was manifest error in the holdings of the Board of Interference Examiners.

In view of our conclusion it is deemed unnecessary to pass upon the questions of appellant's reduction to practice and whether or not he was diligent during the critical period.

The decision of the board is accordingly affirmed and priority of the invention of the count in issue is hereby awarded to the senior party Erwin Kasemann.

Affirmed.

By reason of illness, GARRETT, Presiding Judge, was not present at the argument of this case and did not participate in the decision.