36 C.C.P.A.(Patents)

## SAKLATWALLA v. MARBURG.

### Patent Appeal No. 5487.

United States Court of Customs and
Patent Appeals.
Jan. 5, 1949.

Stebbins, Blenko & Webb, of Pittsburgh, Pa. (William H. Webb, of Pittsburgh, Pa., Donald A. Gardiner, of Washington, D. C., and Morton Burden, Jr., of Pittsburgh, Pa., of counsel), for appellant.

Donald G. Dalton, of Pittsburgh, Pa., (Alfred W. Vibber, of Patterson, N. J., of counsel), for appellee.

Before GARRETT, Chief Judge, and HATFIELD, JACKSON, O'CONNELL, and JOHNSON, Judges.

JACKSON, Judge.

This appeal is from a decision of the Board of Interference Examiners awarding priority of invention of the subject matter of one count to appellee.

The count reads as follows: "A low alloy steel containing 0.05 to 0.14% carbon, 0.07 to 0.18% phosphorous, 0.30 to 0.50% copper, 0.10 to 0.30% manganese, 0.50 to 1.50% chromium and 0.03 to 0.18% titanium, the balance being substantially all commercial steel."

The count did not appear as a claim in the involved applications of either party, serial No. 454,835 of appellee, filed August 14, 1942, and serial No. 496,769 of appellant, filed July 30, 1943; but was formulated by the Primary Examiner and adopted by both parties to the interference While the subject matter of the count is common to both applications, the narrower

ranges of materials such as manganese and copper are set out in the count rather than the broader ranges disclosed by the parties.

The application of appellant is a continuation-in-part of applications, serial Nos. 408,356; 428,510; and 457,835, which were filed August 26, 1941; January 28, 1942; and September 10, 1942, respectively. The application of appellee is a continuation-in-part of an application, serial No. 404,721, filed July 30, 1941.

Both parties filed preliminary statements. Appellant alleged his first written description of the invention defined by the count had been made December 21, 1934; his disclosure to others, April 27, 1938; and reduction to practice, on May 4, 1938. Appellant also alleged the exercise of reasonable diligence in adapting and perfecting the invention since on or before December 21, 1934. Appellee in his preliminary statement alleged conception of the invention during the first half of April 1939; first written description, July 31, 1939; disclosure of the invention to others on or about April 20, 1939; and reduction to practice on April 25, 1939. Between the time of filing his preliminary statement and the hearing before the board, appellant died. The factual record of both parties together with photostats of documents and memoranda were stipulated, and, as filed, constitute the record herein.

The steel defined by the count is a low carbon-copper-phosphorous-manganese alloy steel generally of the same composition as a steel known to the industry as "Cor-Ten" with titanium added to the commercial steel.

Appellant in his application alleges patentable improvements in "Low Alloy, High Strength, Corrosion Resistant Steel" relating particularly to a phosphorous copper steel. He stated in his specification that by the addition of titanium in certain definite percentages, the yield-point of such steel is materially increased: the titanium causes an increment in the yield-point for the reason that it intensifies the yield-point-raising effect of phosphorous "without appreciably affecting" the "ductility or other useful properties" of the steel. It is also stated in the application that the "notch impact resistance," known in the art as "Izod," is improved in most cases by the use of titanium.

The application of appellee relates to "Low-Alloy High-Strength Structural Steels" including the type known as copper-phosphorous-chromium-silicon steel. It is said that such steel can be greatly improved by the addition of titanium "to an extent to analyze 0.02% to 0.03% in the steel." It is also stated that chromium and molybdenum incorporated in the steel gives it added corrosion resistance, and that the effect of titanium in the composition "substantially eliminates" embrittlement from occurring in the steel when used in welding or galvanizing operations.

Appellant was a highly skilled and distinguished metallurgist, probably one of the most outstanding in his field. Appellee also is highly skilled in his art having occupied the position of chief metallurgist at the Vandergrift, Pennsylvania, plant of the Carnegie-Illinois Steel Corporation.

The Board of Interference Examiners, after having analyzed the record on behalf of appellant, held that it failed to prove an actual reduction to practice of the invention prior to July 30, 1941, the filing date of appellee's application. It awarded appellant a date of conception of the invention by at least June of 1938. It further held that appellant had not exercised due diligence in prosecuting the invention from before the time appellee entered the field until appellant's filing date. Because of those holdings, the evidence of appellee concerning reduction to practice was not considered. Counsel for appellant thereupon petitioned the board for a reconsideration and rehearing of its decision. The board, answering in detail all of the contentions in the petition, adherred to its original decision.

In the brief of appellant, the principle error alleged is that the decision required a standard of proof for reduction to practice beyond proper sanction of law. Therefore, the issues here are whether or not the evidence of appellant is sufficient to meet the legal requirements for proof of reduction to practice, and whether appellant, first having conceived the invention, exercised due diligence.

The record for appellant shows that he made a memorandum on December 21, 1934, in which he suggested that copper, chromium, molybdenum, titanium, or vanadium might be used in an alloy to offset brittleness in high phosphorous or carbon alloy steels. Under date of March 12, 1935, he wrote another memorandum containing suggestions for the study of the effect of sulphur, molybdenum, vanadium, or titanium on Cor-Ten steel. On March 3, 1938, appellant made a memorandum in which he suggested that steels of high silicon containing copper and phosphorous would be improved with respect to impact and weldability by the addition of titanium of 0.1–0.3%. In another of his memoranda, dated April 1, 1938, with respect to augmenting the physical properties of a silico-manganese high tensile steel, appellant proposed the addition of titanium and/or aluminum. The percentage of titanium was given as 0.10–0.75% for a general range and 0.25% for high tensile spring and high silicon structural steels. It may be observed here that in the memoranda above noted, there is no specific disclosure of the alloy defined in the count.

Actual preparation of steel conforming to the limitations of the count was begun with a series of heats on May 4, and 5, 1938, by the Battelle Memorial Institute. Prior to the making of those heats, appellant had discussed with Dr. Lorig of the Institute the employment of titanium in low alloy, high tensile strength steels, and "authorized and requested" the Institute to prepare and test a series of titanium bearing Cor-Ten type steels. Pursuant to such request, the Institute prepared those steels, tested the same, and reported results under date of June 30, 1938, which report was received by appellant on July 6, 1938.

It appears from the report that heat runs were made on sixteen different steels in order to study the effect of the addition of titanium. Five of the steels did not contain titanium but were prepared for the purpose of comparison. Among the steels so tested was one known as Heat No. 4051 which corresponded to standard Cor-Ten steel. Heat Nos. 4052 and 4053 were standard Cor-Ten alloys to which had been added

titanium in amounts of 0.1% and 0.2%, respectively, so as to produce in the finished alloy an actual titanium percentage of 0.06% and 0.10%. Heat No. 4055 was standard Cor-Ten steel with 0.2% of titanium and with the chromium content reduced from approximately 1% to 0.5%. It was held by the board, and is agreed by the parties hereto, that the ingredients in Heat Nos. 4052 and 4053 are within the limitations of the count. Heat No. 4055 differed from the percentage ranges of the count by having 0.10% more manganese than the maximum specified in the count. The board stated, however, that such deviation from the limitations of the count was not critical.

All of the steels tested were melted in a 35 KVA induction furnace and the titanium used was in the form of silicon-titanium. Ingots of the steel were forged to 1⅛ inches square and then rolled to ¾ inches round. It appears that the finishing temperature was 1700° F., and that prior to the last two passes through the rolls, the steel was reheated to 1900° F. In the report on the properties of titanium bearing steels, it was stated that they were "as rolled" rather than as "heat treated." Those properties consist of tensile strength, high yield strength, low yield strength, percentage of elongation, and the Izod or impact resisting property.

The board used Heat No. 4051 (standard Cor-Ten steel) as the standard with which to compare the effect of the addition of titanium in Heat Nos. 4052 and 4053. Heat No. 4051 was also used by the board as the standard of comparison for Heat No. 4055, which contained only half as much chromium as Heat Nos. 4052 and 4053.

In the Battelle report are included data sheets in which the above noted properties of the tested steels were listed. Those sheets disclose that the tensile strength of Heat No. 4052 was higher than the same strength shown in the standard Cor-Ten, Heat No. 4051; that the high yield strength and the low yield strength of Heat No. 4052 was lower than in Heat No. 4051; that the percentage of elongation (ductility) of Heat No. 4052 was less than that contained in Heat No. 4051; and the

impact resistance of Heat No. 4052 was very much lower than that of Heat No. 4051. In Heat Nos. 4053 and 4055 the high and low yield strengths were somewhat higher than those of Heat No. 4051, but the percentage of elongation and the impact resistance was less than those properties of Heat No. 4051. Heat No. 4055 was very much lower in impact resistance than any of the other heats.

Dr. Lorig commented on the results of the heats of those steels containing titanium and the effect of added titanium in different percentages on Cor-Ten steel. He noted in his report that there were some interesting effects from the use of titanium, particularly with respect to its use in quantities greater than 0.2%. He observed that the yield strength and ductility of Cor-Ten steel were improved by the addition of titanium in quantities above 0.2% but that smaller additions were not effective.

It appears that only one other series of heats of steels containing titanium were made prior to the date of appellee's constructive reduction to practice. A report was made on those heats dated September 13, 1938, in which it was stated that the work on those steels had been outlined by appellant when he visited the Institute on August 7, 1938. The steels of the latter series were prepared in the same fashion as those of the former series, except for the difference in size of the square bars. In the latter series, the ingots were forged to $1\frac{1}{4}$ inches instead of $1\frac{1}{8}$ inches square before rolling, and also the bars were reheated to a temperature of 2000° F. instead of 1900° F. before making the last two passes.

It appears that of the heats in the latter series, four had analysis that approximated the limitations of the count. They were Heat Nos. 4357, 4360, 4425, and 4364. While Heat No. 4425 was not analyzed, it was said by the board to have been made up with the same chemical composition as Heat No. 4357.

[1, 2] It appears from this report that in Heat Nos. 4357, 4360, and 4364, the manganese content exceeded the top limit of manganese set out in the count by 0.03% or 0.04% and also that the copper content in Heat Nos. 4360 and 4364 was less than the lower limit of copper required in the count. In Heat No. 4357, the titanium content exceeded by 0.03% the critical top limit defined by the count of 0.18%. Because Heat No. 4425 was made up to have the same chemical composition as Heat No. 4357, it likewise exceeded the said mentioned upper limit of titanium. Therefore, it appears no steel was made in the latter series of heats which conformed exactly to the limitation of the count. It is trite to state that in interference proceedings, all limitations in the counts must be considered as material. Land v. Kasemann, 162 F.2d 498, 34 C.C.P.A., Patents, 1191; Frank v. Hollerith, 159 F.2d 774, 34 C.C.P.A., Patents, 863; Kenyon v. Crane, 120 F.2d 380, 28 C.C.P.A., Patents, 1208; Brown v. Edeler & Richardson, 110 F.2d 858, 27 C.C.P.A., Patents, 1091; Pelzer v. Weaver, 97 F.2d 166, 25 C.C.P.A., Patents, 1232; Bard v. Flodin, 82 F.2d 424, 23 C.C.P.A., Patents, 1045; Bernard v. White, 88 F.2d 741, 24 C.C.P.A., Patents, 1054; Lindley v. Shepherd, 58 App.D.C. 31, 24 F.2d 606; Deutsch & Werner v. Ball, 77 F.2d 930, 22 C.C.P.A., Patents, 1322; Doherty v. Dubbs, 68 F.2d 373, 21 C.C.P.A., Patents, 807; Wilson v. Ellis, 42 App.D.C. 552. Therefore, that series of heats and the tests reported may not properly be considered as evidence of reduction to practice of the alloy of the count in issue.

Counsel for appellant, in their petition for reconsideration and rehearing, among other things, alleged that the reports and appellant's comments thereon show that his conclusions and those of the Institute were not based upon the results of a single heat test; but pursuant to sound research procedure, comparisons were made, not with a single heat of standard Cor-Ten, but with others. In that connection, they pointed out the properties of four heats of steel not containing titanium, numbered 2916, 2917, 3166, and 4425, as set forth in Table IV of the report of September 13, 1938. Upon examination it appears that Heat No. 4425 is not contained in said Table IV.

In their brief counsel for appellant list Heat No. 2913 in addition to the four heats just mentioned. They argue it is inconceivable that such highly skilled scien-

tists as Dr. Lorig and appellant would draw their conclusions by comparing the test results of Cor-Ten to which titanium had been added, with a single heat of the sixteen poured in April and the thirty-eight heats which were poured in September. The conclusive answer to that argument, we think, is that neither the tribunals of the Patent Office nor this court can reasonably ascertain from the record what may have been in the minds of those two skilled engineers in their experimentation with Cor-Ten steel to which titanium had been added.

Counsel for appellant further argue that Heat No. 2913 was used by appellant as a standard of comparison. We are unable, due to the paucity of the record, to understand why that heat should be considered as the standard governing the alleged conclusions of. appellant. It is certainly not shown in the record. It is clear that Heat No. 4051, designated as standard Cor-Ten steel and written up as having been processed under identical conditions with those of the titanium test runs made at the same time, is the proper standard, as held by the board, rather than as contended by appellant, a standard Cor-Ten steel made at a different time and under unknown conditions. The record shows that in the production of those steels the finishing temperature was highly critical. Therefore, we may not properly hold that appellant sustained his burden of proof by a preponderance of the evidence, or that the tests set out in the record were sufficient to show that an alloy steel conforming to the count was any better than Cor-Ten steel without the addition of titanium. The other heats which were mentioned together with Heat No. 2916, and hereinbefore set out, were not standard Cor-Ten steels for the reason that they contained manganese, high copper, no chromium and added nickel. Therefore, those steels could not properly be compared as standard Cor-Ten steel with the steels produced containing titanium even though the conditions under which all were produced were identical.

Subsequent to the last report mentioned herein, no evidence appears of any preparation of titanium steel alloys until Decem-ber 1941, which was about five months subsequent to appellee's earliest date. It is true that on October 4, 1938, December 29, 1938, and September 12, 1939, appellant made certain notes with respect to steel containing titanium but those notes of themselves may not be considered as proof of a reduction of the invention to practice. There is nothing further in evidence other than those notes from which exercise of reasonable diligence by appellant in reducing the invention to practice between October 1938 and December 1941 can be inferred. Therefore, the issue is on the question of whether or not any of the heats appearing in the reports of. July 30 and September 13, 1938, is sufficient to establish an actual reduction of the invention to practice prior to appellee's filing date of July 30, 1941.

It has been contended throughout this proceeding that the mere preparing and testing of alloy steel with contents the same as those defined by the count is sufficient to establish actual reduction to practice. In line with such contention, counsel for appellant argue that the making of Heat Nos. 4052, 4053, and 4055, as well as Heat Nos. 4357 and 4425 constitutes a reduction of the invention to practice according to accepted legal standards. With respect to Heat Nos. 4357 and 4425, since they did not meet the limitation of the count and have been hereinbefore disposed of, it is not necessary to comment upon them.

It is true that in May 1938, at the Battelle Memorial Institute, three steel heats, Nos. 4052, 4053, and 4055, were poured, and the steels so prepared had compositions corresponding to the limitations of the count. It is also true that those steels were tested in accordance with recognized standards in the steel industry. The characteristics of those steels, hereinbefore noted, disclose improvement over the properties of Cor-Ten steel in some respects while in others the Cor-Ten steel is superior. It seems to us, particularly in view of appellant's aim to fabricate a steel superior to Cor-Ten steel, and his failure to produce a steel up to the elongation or ductility properties and well below the Izod of standard Cor-Ten shown by Heat

No. 4051, that it cannot be said he has reduced the invention to practice.

The board expressed a doubt as to whether or not the tests made by the Institute and reported by it really convinced appellant that the alloy steel with titanium so tested had utility within the meaning of the patent laws and were of such value as to warrant a patent grant, citing the case of Muskat et al. v. Schmelkes, 140 F. 2d 984, 31 C.C.P.A., Patents, 837. Counsel for appellant contend that the board misinterpreted the actual holding in that case and expanded an isolated statement therein to the extent of declaring an incorrect rule of law not sanctioned by any court.

In that case, the subject matter of the interference was a chemical composition known as "Chlorinated Melamine." The composition was said to be especially useful in the destruction of bacteria in milk and drinking water. Schmelkes filed his application after Muskat et al. had obtained a patent and of course was under the burden of establishing reduction of the invention to practice beyond a reasonable doubt. Schmelkes contended that he had reduced the invention to practice about eight years prior to the filing date of his application. We held that Schmelkes did not establish that he had tested his product for "stability" at the time he claimed he had reduced the invention to practice. In so holding, we relied among other things, upon the lack of suitable tests for stability of the chemical composition. With respect to appellant's contention, the following portion of our decision in the Muskat case, supra [140 F.2d 989], appears in his brief as follows: "We do not so understand appellants' position. We think their contention when boiled down—and we agree with it—briefly is that before one is entitled to an award of priority based upon an actual reduction to practice, it must be disclosed satisfactorily, especially where; as in this case, the proof must be beyond a reasonable doubt, that the inventor so tested his product (if of the character requiring tests) as to bring conviction at least to him that the product has *utility within the meaning of the patent laws and is of such value as to warrant a patent grant.*" (Italics quoted.)

It is argued that the italicized words in the quotation which appear in the decision of the board were used to expand the rule of law with respect to reduction to practice. The board, in our opinion, did not misinterpret our actual holding in that case. We laid down a standard which must be met in order to prove an actual reduction to practice of a composition of material. That case was decided January 3, 1944, and conforms to the same standards regarding the quantum of proof to establish reduction of an invention to practice that had been theretofore set out by this court many times. Whitehead v. Diamond, 97 F.2d 604, 25 C.C.P.A., Patents, 1357.

There we were concerned with the question as to whether the mere making of an artificial thread corresponding to the counts constituted a reduction to practice of the invention. The thread was said to be of value because it was delusterable. Whitehead made tests to determine whether the thread delustered under only one set of conditions and for only one period of aging of the yarn. The utility of the product depended upon the extent to which it delustered and its behavior during aging for longer periods than that consumed in one laboratory test. We held that Whitehead had not reduced the invention to practice and that he was still in the realm of uncertainty as far as reduction to practice was concerned. Knutson et al. v. Gallsworthy et al., 82 U.S.App.D.C. 304, 164 F. 2d 497.

It is true that there are certain articles or substances which are fully reduced to practice when made without the need of tests, because the utility in the pertinent art is well understood. Larson et al. v. Eicher, 49 F.2d 1029, 18 C.C.P.A., Patents, 1497. The steel defined in the count herein is obviously not in that class of articles.

It is to be noted that the application of appellant containing a disclosure which supports the count was not filed until long after his alleged reduction to practice and subsequent to the filing date of appellee. It seems to us that if appellant had been satisfied that he had produced a steel which was a patentable improvement over Cor-

Ten or similar steels which were old in the art or that the Cor-Ten titanium steel which he produced had patentable utility he would not have risked the loss of benefits accruing to a patent by such long delay in filing his application. It must be remembered that appellant was experienced in steel research and undoubtedly was "patent wise."

In view of what has been hereinbefore said we are of opinion that the principles announced in the Muskat case, supra, with respect to reduction to practice and diligence were correctly interpreted by the board and are applicable to the facts in the instant case.

It requires something more than a mere new ratio of proportions in the ingredients constituting an article to render the product patentable. It was stated in the case of Bethlehem Steel Co. v. Churchward International Steel Co. (Carnegie Steel Co., Intervener), 3 Cir., 1920, 268 F. 361, 364, as follows: "But novelty of proportions in the sense of the patent law involves something more than figuring out proportions differing from any that were known before. It involves new results from new proportions, developing a new metal, or, it may be, an old metal with new characteristics of structure or performance, embracing entirely new, or at least substantially enhanced, qualities of utility. [Milligan & Higgins] Glue Co. v. Upton, 97 U.S. 3, 24 L.Ed. 985; Welling v. Crane, C.C., 21 F. 707; Brady Brass Co. v. Ajax [Metal Co., 3 Cir.], 160 F. 84, 90, 87 C.C.A. 240; Pittsburgh Iron & Steel [Foundries] Co. v. Seaman-Sleeth Co., [3 Cir.] 248 F. 705, 160 C.C.A. 605; Miami Copper Co. v. Mineral Separation, Ltd., [3 Cir.] 244 F. 752, 157 C.C.A. 200."

It seems to us that the above quotation is apposite to the present case.

We agree with the board that, in view of all of the circumstances herein, appellant has not sustained his burden of proof in establishing reduction to practice. He is entitled to a date of conception prior to that of appellee, as was held by the board, but the evidence before us is not convincing that he actually reduced or was ever convinced he had reduced the invention to practice, and certainly his evidence is not sufficient to show diligence in filing his application.

We have examined with care all of the authorities cited by counsel for appellant, but in view of what has already been stated we deem it unnecessary to refer to those authorities. Contentions other than those hereinbefore set out have been urged by counsel for appellant and they have been given due consideration, but in our opinion it is unnecessary to discuss them.

For the reasons hereinbefore set out, the decision of the Board of Interference Examiners is affirmed.

Affirmed.