**40 C.C.P.A.** (Patents)

### GUINOT et al. v. HULL.
### Patent Appeals No. 5906.

United States Court of Customs and Patent Appeals.

April 15, 1953.

Rehearing Denied May 29, 1953.

Stevens, Davis, Miller & Mosher, Ellsworth H. Mosher, and Melvin W. Sandmeyer, Washington, D. C., for appellants.

Clarence M. Fisher, Washington, D. C. (Daniel I. Mayne and Harold N. Powell, Rochester, N. Y., and Ernest H. Merchant, New York City, of counsel), for appellee.

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Judges.

WORLEY, Judge.

This is an appeal in an interference proceeding by the senior party, Henri Martin Guinot and Louis Alheritiere, from a decision of the Board of Interference Examiners of the United States Patent Office which awarded priority of invention to the junior party, David C. Hull.

The interference was declared on May 21, 1947, between a patent to Hull, No. 2,428,846, issued October 14, 1947, on an application filed December 27, 1945, and ap-

pellants' application, Serial No. 592,719, filed May 8, 1945, which was held by the examiner to be entitled, under the Boykin Act, Public Law No. 690, 35 U.S.C.A. § 100 et seq., to the benefit of their French application, Serial No. 466,498, filed March 20, 1942. It was incumbent upon the junior party Hull, appellee here, to establish priority by a preponderance of the evidence. In an effort to discharge that burden, appellee took the testimony of witnesses and introduced in evidence certain documentary exhibits. Appellants, in electing to stand on the filing date of their French application, took no testimony and introduced no exhibits.

The subject matter of the invention is embraced in six counts, four of which are claims taken from the patent to appellee, and two of which are modified patent claims. The broadest, and also deemed to be the most illustrative, is count 1 which reads as follows:

"1. The method of producing aldol by condensation of acetaldehyde which comprises continuously circulating a solution of acetaldehyde in aldol through a temperature-controlled reaction chamber, adding acetaldehyde and an aldol condensation catalyst to the circulating solution and withdrawing a portion of the circulating solution."

The record in the case is extensive; the opinion of the board is thorough and comprehensive; and the briefs filed by counsel for the parties are clear and concise.

In his preliminary statement appellee alleged first disclosure to others, written description of the invention, reduction to practice, and the exercise of reasonable diligence in perfecting the invention as of January 9, 1941, that date being approximately fourteen months prior to the filing date of the French application, upon which the senior party Guinot et al. relies.

The two features herein are the steps of continuously circulating a solution of acetaldehyde in Aldol through a temperature-controlled reaction chamber, and of adding acetaldehyde and an aldol condensation catalyst to the circulating solution and withdrawing a portion of the circulating solution.

During the interlocutory stage, Hull moved, among other motions, to dissolve the interference on the ground that Guinot et al. were not entitled to the benefit of their French filing date because that application did not disclose "a temperature-controlled reaction chamber," as recited in each of the counts, nor did it disclose "adding an acid to neutralize the alkaline catalyst." That motion was denied by the examiner and that action was not disturbed by the board. In view of our conclusion it is not necessary to consider that question.

Thus the basic issue here, as below, relates to the question of proof on the part of Hull to show that aldol was actually produced, as alleged. As succinctly stated by the board

"The strict priority phase of the case is somewhat simplified by admission by Guinot et al. that laboratory work allegedly performed in behalf of Hull in 1941 was in fact performed in the manner and at the times related by the witnesses * * *. *The position of Guinot et al. is that conceding the 1941 work of Hull there is no sufficient proof by chemical analysis that aldol was produced.* Further both parties were in agreement at final hearing that in order for Hull to prevail his 1941 activities must be shown to be a reduction to practice and that it is unnecessary and immaterial to the case to find when Hull conceived the invention. This consideration also eliminates any question relating to diligence." (Italics ours.)

In view of the technical nature of the process involved and in order to provide some background of the state of the art, we believe it advisable to quote at length from the decision of the board relative to those matters.

"The reaction involved in the process of the counts is known historically in organic chemistry as the 'aldol condensation.' It is relatively ancient, well known and well investigated. It is famous as a mechanism for organic synthesis and every organic chemistry text at hand devotes a section to it. (Richter, 1899; Reid, 1929; Norris,

1931; Whittemore, 1937; Karrer, 1938; Fieser and Fieser, 1944). Whittemore (Organic Chemistry, 1937, p. 236) attributes the reaction to Wurtz in 1872 and states: 'Such aldol combinations are of the utmost value in synthetic chemistry.' Richter in the American publication of 1899 mentions the condensation and its utility on page 193 thereof. Remsen in his Organic Chemistry of 1906 mentions the condensation in connection with the formation of inactive fructose from glycerose (Hull Exhibit 7). Through the years the mechanism of the reaction has become better understood and of increased usefulness.

"The traditional reaction, the one with which we are concerned, is the aldol condensation in which two molecules of acetaldehyde in the presence of a base as catalyst and at appropriate temperature condense to form one molecule of aldol as follows:

$$\overset{\alpha}{CH_3\ CH} + HCH_2\ CH = CH_3\ \overset{\beta}{CHCH_2}\ \overset{\alpha}{CH}$$

$$O \qquad O \qquad OH \qquad O$$

acetaldehyde + acetaldehyde = aldol (b.p. 83°/20mm)
or
beta-hydroxy-n-
butyraldehyde

As indicated by the texts the reaction is dependent upon the activated character of the three hydrogens in the alpha position with respect to the carbonyl group $(=C=O)$ of the adding molecule, one of which under the influence of small amounts of alkalis (alkali bicarbonates and carbonates, alkali acetates, dilute sodium hydroxide, and alcoholates) adds on to the oxygen of another aldehyde molecule (See Karrer, 1938, p. 144; Whittemore, 1937, p. 236; Norris, 1931, p. 192; Reid, 1929, p. 193). The texts also bring out that when aldol is formed the structure is such that the beta hydroxyl group is adjacent another of the active alpha hydrogens which condition is favorable for the formation and elimination of water upon heating. This results in crotonaldehyde $CH_3\ CH = CHCHO$, a useful compound but possessed of an extremely irritating odor. The ready formation of crotonaldehyde is thus a persuasive indication that the product heated contained aldol.

"Reaction conditions for carrying out the aldol condensation were old and well known prior to Hull's 1941 activities as exemplified by the patents made of record by Guinot et al. A number of these patents were made of record in the Hull patent prosecution including Grunstein 1,234,156, Matheson 1,450,-984, Herrly 1,598,522, Mueller-Cunradi et al. 1,881,853, and Thompson 2,-318,341. The last patent was granted May 4, 1943, but the application was filed July 22, 1937, and it represented a development out of the same Kingsport, Tennessee branch of the Eastman Kodak Company as the involved Hull activity. The first three patents involve batch processes and the last two continuous processes.

"Grunstein used alkaline earth carbides as promoters and need not be discussed except to note that he taught that the aldol condensation generates a great amount of heat which if not controlled by strong cooling to 20° C resuts in the production of higher polymers partly in place of the dimer aldol.

"Matheson, Patent No. 1,450,984, used sodium hydroxide as promoter along with temperature control. Sodium hydroxide was used in about .5% concentration. The reaction if maintained below 10° C shows no signs of resin formation but if allowed to rise to

20° C for short periods still gives good results. The product is a thick colorless material which should be neutralized, surphuric acid being suggested. If more than the prescribed amount of alkali be used there results a mixture of aldol with higher polymers, from which the aldol may be separated by distilling in vacuo. Herrly, Patent No. 1,598,-522, taught in reference to the same reaction that aldol could be satisfactorily produced with the temperature rising to 40° to 50° C but not in excess thereof provided the free alkali used was not in material excess of .1%. Nine hours is the time taken for the reaction after which the batch is cooled to about 20° C and carefully neutralized with sulphuric acid. If excess acid is used higher polymers result. Completion of the reaction is ascertained by taking the specific gravity of the batch.

"Mueller-Cunradi, Patent No. 1,881,-853, contributed a continuous process. The reaction is carried out in four stages in series cooled efficiently to 3°, 8°, 15°, and 20° C respectively. About .4% sodium hydroxide in proportion to the acetaldehyde is used but is added in the various stages.

"The Thompson patent, 2,318,341, is concerned mainly with a series continuous process for producing paraldehyde from acetaldehyde using an acid catalyst but does mention the use of the process using an alcoholic catalyst to produce aldol. Thompson points out that the continuous process has the advantage over the batch process in providing better heat control. When aldol is to be produced it is suggested that sodium hydroxide be used and temperature maintained between 5–25° C. The product should be neutralized and acetic acid is suggested.

"Hull's inventive contribution over the foregoing was not in reactants or reaction conditions but in a manipulative improvement in the continuous process. As he points out in the remarks (page 5) accompanying his ap-plication amendment of February 6, 1947, the vital distinguishing feature of his invention over the prior art is that: *'a solution of acetaldehyde in aldol is continuously circulated or recycled through a temperature-controlled reaction chamber.'*" (Italics ours.)

Because the sole issue here is whether the board erred in holding that the evidence submitted by Hull was sufficient to prove the actual production of aldol in the manner contained in the counts, we refer to previous holdings of this court on the measure of proof generally required under such circumstances.

As a preliminary thereto, we believe the following observation by the board is appropriate:

"Much of the difficulty ascribed to interference case law on chemical subject matter arises out of the nature of chemistry. In contrast to a mechanical invention for example, which has durability and easily identifiable individuality, the chemical invention often has neither. The new chemical process if *not continued in operation is evanescent.* Once carried out proof of its former existence is for the most part in records and the variable reliability of witnesses' memories. The newly synthesized chemical product frequently looks like a number of others and is seldom self identifiable. Moreover, because of the greater variety of factors governing each chemical reactant as contrasted to the physical parts of a machine predictability of results has been less secure in the case of a new reaction. Determination of results in new reactions as a rule must be had on an empirical basis. The difficulties inherent in corroborating a transient phenomenon of some involvement have led to pleas for relaxation of the corroboration rule.

"These pleas have received a sympathetic hearing and an explanation why notwithstanding the difficulties the rule cannot be relaxed beyond a certain line of demarcation. The line of demarcation is that the proof in order to re-

ceive weight as corroboration must not stem from the inventor but must be independent of the inventor. * * * "

A study of the cases issuing from this court reflect the consistent application of the doctrine of independent corroboration of the inventor; that each case is decided upon the basis of the facts therein; and that the entire record is examined to determine whether the necessary proof is present in a given case.

In the instant case, the first witness called on behalf of appellee was one Louis Sartain who held a B.S. in chemistry from the University of Tennessee and who was employed by the Tennessee Eastman Company in research and development work and in assisting in directing production in the acid division of that company. Mr. Sartain testified that he had been instructed by Hull to set up an apparatus for the purpose of conducting aldol condensation in a continuous manner; that he had been acquainted with aldol since 1937 and had produced aldol in batches previous to the time he began working under Hull's supervision; namely, the latter part of December 1940; that Hull had directed that the reaction be carried out at approximately 10 degrees C., that being the critical temperature; and that such temperature was to be maintained with a brine-cooled jacket around the reaction column; that when a portion of the aldol from the reaction column was withdrawn, it was to be neutralized with acetic acid; that numerous tests and analyses convinced him that the mixtures contained a high percentage of aldol; and that the first laboratory apparatus for the purpose of conducting aldol condensation in a continuous manner was constructed by him during the week preceding January 9, 1941

The testimony of that witness was corroborated by a Mr. J. Range Snodgrass who held a master's degree in chemistry from the University of Tennessee, and by one Clair A. Marshall, Acting Assistant Superintendent of the Acetic Acid Department of the Tennessee Eastman Company.

Further testimony of Mr. Sartain discloses that the production of aldol by the condensation of acetaldehyde is an old reaction and described in numerous textbooks, and the purpose of his experiments was to produce it by a continuous method which could more easily be adapted to plant use, and that the purpose of so producing aldol was to make butyric acid from the product. The witness explained the steps in the conversion of aldol as follows:

"The Aldol is heated to about 85 degrees centigrade, at which point a molecule of water is given off and crotonaldehyde is formed. The resulting crotonaldehyde is hydrogenated to form butyraldehyde. The butyraldehyde is then oxidized to form butyric acid."

The record discloses that the butyric acid was reacted with cellulose to form a plastic sold by Eastman Kodak Company under its trade mark "Tenite."

On Sartain's induction into the Army, February 1941, the experimental work was assigned by Mr. Marshall to one Ralph Merryman who held a B.S. in Chemical Engineering from the University of Tennessee, and a M.S. from Georgia Institute of Technology, and who, at the time of the taking of testimony, had resigned from the Tennessee Eastman Company. Mr. Merryman testified that he had been instructed by Mr. Marshall to follow the work done by Mr. Sartain but to go into it on a more extensive scale; that prior to this time the only work done on the condensation of acetaldehyde with caustic had been on a laboratory scale; that although it had been a long time past, the most convincing thing he remembered was that they went further with the product and produced crotonaldehyde which was much easier to identify than aldol; and that crotonaldehyde can be readily identified because of its very disagreeable odor.

Upon the resignation of Mr. Merryman, one Robert Teeter was assigned to carry forward the work done by Sartain and Merryman. Mr. Teeter was a chemical engineer with a B.S. degree from Kansas State College. He was instructed to check and become familiar with the work of his predecessors in the aldol condensation field

and to design a pilot plant for the purpose of studying subsequent steps in the reaction. He was assigned to perfect the means by which an analysis both of aldol and crotonaldehyde could be made and, before proceeding on that work, he made tests on the apparatus of both Mr. Sartain and Mr. Merryman to prove to his satisfaction that aldol had indeed been made by them. The product he recovered in those tests looked and felt like aldol and was converted to crotonaldehyde by the known process. Mr. Teeter was so sure that the reaction produced aldol that he then went ahead with the design and construction of the pilot plant, as he had been instructed to do. The pilot plant was built under Marshall's supervision, its purpose being to produce larger quantities than could be produced in the laboratory. The witness testified there was never any question in his mind or in the minds of others but that the product produced was aldol. After it was proved to their satisfaction that they obtained the product sought, the pilot plant was dismantled and Mr. Teeter set about to design a semi-works plant for a larger production of aldol to be converted into crotonaldehyde for use in making butryic acid for reacting with cellulose to produce "Tenite."

At the time of taking of testimony, that plant was still in operation and all operations had their basis in appellee's original conception of the idea of introducing acetaldehyde containing an alkaline catalyst into a circulating body of liquid which is cooled to maintain a relatively low temperature, by which the reaction was controlled. The liquid, including the aldol, arose to the top of the chamber and was withdrawn therefrom, and the aldol was neutralized with acetic acid. This is the method in issue and the evidence shows that in each phase of the development, aldol was produced and it was identified as such by various tests. Those tests included the distillation under vacuum of samples of the crude reaction product from the aldol reaction where the unreacted aldehyde was distilled off first, then the water and some crotonaldehyde that was produced by excessive heat was next distilled off, and the third

compound distilled was aldol which boiled at 80 to 91 degrees at 20 millimeters. That it was aldol, the chemists were satisfied because it had all the characteristics of pure aldol, that is, the odor, physical appearance, and boiling point. Tests also were made against the aldol produced batch-wise in the laboratory to the apparent satisfaction of all that aldol had indeed been produced by the continuous method.

With respect to the foregoing testimony, the board stated, and correctly we believe, in relation to the facts here present:

"It appears just and reasonable that where a reaction in chemistry has been so thoroughly explored that repeated past experience shows that under prescribed reaction conditions a certain product must necessarily result it should not be necessary to conduct extensive tests to identify the product. The need for identification exists in ratio to the uncertainties present. Where the uncertainties are less the need for identification is lessened. * * * Where uncertainties are nonexistent in a well known process observation of the reaction conditions of the well known process should be conclusive on the identity of the product and where they are of no practical consequence even a physical check may be sufficient. Conversely where the uncertainties are material more identification in proportion is necessary * * *.

"Recapitulating it is apparent that a case is entitled to be tried on the individual merits of its evidence, that such evidence may include facts and circumstances other than the testimony of an independent witness and that such facts and circumstances, provided they do not stem from the inventor and are competent evidence are entitled to appropriate weight. Further in the case of identification of the product of a process the method by which the product is made is part of the facts and circumstances and all such evidence in the record is appropriate to be considered to the extent necessary in evaluating

the degree of identification necessary in relation to how much is known or uncertain in the process. In short the degree of proof required is in proportion to the uncertainties and burden of proof of the individual case."

The board further observed, relative to the evidence of record, that

"*Obviously the innovation of recycling, since it provided only a means of better control over temperature and mixing, introduced no new unknowns, uncertainties or imponderables over the well established reaction of the prior art. No new chemicals, catalysts or temperatures were used and within the range of conditions laid down by the prior art criticality was not a factor. The chemical laws governing the reaction as in any other reaction do not act capriciously and the conditions calling those laws into operation having been met, the product expected on the basis of experience was inevitable. The method by which the product was made is controlling. Under such circumstances the chemists were justified in the assumption they had produced aldol and there was no need for extensive proof or chemical analysis of the product. Observance of the prescribed conditions of reaction is the main criterion of the identity of the product in the circumstances here where uncertainties are lacking.* (Italics ours.)

"Nevertheless, there were certain rough checks exercised against the product. Color according to degree indicated higher polymerization and was largely avoided. The product was checked for specific gravity against a curve prepared some years before on the batch system. Most conclusively the product upon heating converted to the characteristic irritating lachrymator crotonaldehyde, a check prescribed by the texts. Finally although it was not a current check the subsequent history furnished convincing circumstantial evidence justifying the earlier conclusion."

The contentions of appellants have been carefully examined but we are unable to agree that under the facts and circumstances of this case, the appellee failed to properly discharge his burden of proof. The decision of the Board of Interference Examiners is, therefore, affirmed.

Affirmed.